**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JUAN MANUEL REYES,

               Petitioner,

    v.

RAYMOND MADDEN, Warden,

               Respondent.

Case No. SA CV 16-02125 GW (AFM)

**CORRECTED REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

This Report and Recommendation is submitted to the Honorable George H. Wu, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

**INTRODUCTION**

On November 29, 2016, petitioner filed, through counsel, a Petition for Writ of Habeas Corpus by a Person in State Custody (28 U.S.C. § 2254). The Petition raises three claims of instructional error directed to petitioner's conviction of first-degree murder and other crimes relating to his participation in a gang-related shooting.

On January 4, 2017, respondent filed an Answer. On February 1, 2017, petitioner filed a Reply.

Thus, this matter is ready for decision. For the reasons discussed below, the Court recommends that the Petition be denied and that this action be dismissed with prejudice.

## PROCEDURAL HISTORY

On November 6, 2007, an Orange County Superior Court jury convicted petitioner of first-degree murder, shooting at an occupied motor vehicle, discharging a firearm in a school zone, street terrorism, and three counts of attempted murder. The jury also found true allegations of gang affiliation and firearm use. Petitioner's co-defendant, Jesus Guerrero, also was convicted of several crimes, and petitioner's other co-defendant, Armando Solano, was convicted of street terrorism. Petitioner was sentenced to state prison for life without the possibility of parole. (11 Reporter's Transcript ["RT"] 2099-126, 2136; 5 Clerk's Transcript ["CT"] 1307-51; 6 CT 1607.)

Petitioner had three direct appeals in the state courts. In the first proceeding, the California Court of Appeal rejected all of petitioner's claims and affirmed his judgment of conviction. (Respondent's notice of lodging, Lodgments 3, 7.)

In the second state appeal, petitioner filed a motion to recall the remittitur on the ground that his appellate attorney was ineffective for failing to raise particular issues on appeal. (Lodgments 8-10.) The California Court of Appeal granted the motion and reinstated the appeal. (Lodgment 11 at 3.) The Court of Appeal then vacated petitioner's sentence of life without the possibility of parole in light of the fact that he was only 17 years old when he committed the crimes; in all other respects, the judgment was affirmed. (Lodgment 14.) The California Supreme Court then summarily denied a Petition for Review. (Lodgments 15 and 16.)

Petitioner was resentenced to 50 years to life in state prison. (Lodgment 18 at 13-15; Lodgment 19 at 55.)

In the third state appeal, petitioner claimed that his new sentence of 50 years to life was cruel and unusual punishment in violation of the Eighth Amendment. (Lodgment 20.) The Court of Appeal agreed and modified petitioner's sentence to ensure that he will receive a parole hearing after 25 years, but affirmed the judgment in all other respects. (Lodgment 27.) The California Supreme Court then summarily denied a Petition for Review. (Lodgments 28-29.)

Petitioner filed this Petition on November 29, 2016.

## SUMMARY OF THE EVIDENCE

Petitioner was convicted of the murder of Abraham Ortega and the attempted murder of three other people, under a theory that petitioner aided and abetted the actual shooter, Jesus Guerrero. The California Court of Appeal set forth the following summary of the evidence from petitioner's trial. (Lodgment 14 at 2-4.)[1]

> On December 1, 2005, [petitioner] and Guerrero were 17 and 20 years old, respectively. They were also members of Hard Times, a criminal street gang that claims territory in Garden Grove, including Santiago High School. That day, [petitioner] "hit up" 16-year-old Abraham Ortega at the school by asking him what gang he was in. When Ortega replied "Santa Nita," a rival outfit, [petitioner] said, "Fuck Santa Nita, this is Hard Times." However, before anything further transpired, campus security showed up and defused the

---

[1] The Ninth Circuit has held that the factual summary set forth in a state appellate court opinion is entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1), which a party may rebut only by clear and convincing evidence that the facts were otherwise. *See Brown v. Horell,* 644 F.3d 969, 972 (9th Cir. 2011); *Moses v. Payne*, 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Tilcock v. Budge*, 538 F.3d 1138, 1141 (9th Cir. 2008); *Mejia v. Garcia*, 534 F.3d 1036, 1039 n.1 (9th Cir. 2008). Petitioner has not attempted to rebut the Court of Appeal's factual summary.

situation.

Five days later, shortly after school let out, the gangs crossed paths again. Santos Gomez arrived at the rear of the school with fellow Santa Nita members Alejandro Chavez and Danny Funes in tow. Funes crossed out some Hard Times graffiti that was on a wall and replaced it with "VSN," which stands for Varrio Santa Nita, and the words "now what?" It didn't take long before the group, which soon included Ortega, drew the attention of others.

Hard Times member Juan Manzanares spotted them first. He talked to Baltazar Moreno about the situation, and the two of them tracked down [petitioner], who was hanging out at the school quad with several other Hard Times members. Manzanares told [petitioner] about the Santa Nita members, whom he derogatorily referred to as "chonklas," and said, "[W]e are going to get them." Manzanares, [petitioner] and Moreno then set off to confront their rivals.

As they made their way to the back of the school, Manzanares phoned Guerrero several times. He told him where the Santa Nita members were and urged him to bring a gun to that location. But Manzanares didn't wait for Guerrero to arrive before instigating a confrontation. With [petitioner] and Moreno at his side, he asked Ortega where he was from. Ortega said Santa Nita, and one of his companions made a gang sign with his fingers. Moreno then yelled out, "Fuck Santa Nita, this is Hard Times," and with that, the two groups started fighting.

Santa Nita initially had a four-to-three advantage in terms of manpower, but Hard Times supporter Rene Garcia soon joined in to even the numbers. At one point during the fight, someone from Hard Times said something like, "Where the fuck is Abel?" Then Guerrero,

4

whose nickname is "Evil," and fellow Hard Times member Armando Solano came running up to the scene. Guerrero was holding a gun, and upon seeing him, the four Santa Nita members retreated to Gomez's nearby jeep. As they started to drive away, Solano told Guerrero "not to do it here," but someone else yelled "dump on them." At that point, Guerrero fired several shots at the jeep, one of which struck and killed Ortega.

Gang expert Jonathan Wainwright testified to the rivalry between Hard Times and Santa Nita, describing them as "turf-orientated" Hispanic street gangs. He also described the criminal activities of Hard Times, explaining that gang members often commit acts of violence to induce fear and achieve respect in the community. Based on the circumstances of this case, Wainwright believed [petitioner] acted in association with, and for the benefit of, Hard Times. In fact, he said [petitioner's] actions were indicative of "a classic gang hit-up which ultimately ended in a homicide."

## PETITIONER'S CLAIMS

1. The jury instruction on the gang-special-circumstance allegation violated petitioner's federal constitutional rights. (Petition at ¶ 7a; Petition Memorandum ["Mem."] at 13-16; Reply at 6-7.)

2. The jury instruction on homicide in the defense of others violated petitioner's federal constitutional rights. (Petition at ¶ 7a; Petition Mem. at 17-22; Reply at 7.)

3. The jury instruction on the natural and probable consequences doctrine violated petitioner's federal constitutional rights. (Petition at ¶ 7a; Petition Mem. at 23-34; Reply at 7-9.)

**STANDARD OF REVIEW**

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Carey v. Musladin*, 549 U.S. 70, 74 (2006).

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See Williams*, 529 U.S. at 391, 413. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *See Williams*, 529 U.S. at 406. However, the state court need not cite or even be

aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *See Early*, 537 U.S. at 8.

State court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or based on 'an *unreasonable* determination of the facts.'" *See Early*, 537 U.S. at 11 (citing 28 U.S.C. § 2254(d)) (emphasis added). A state-court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See Williams*, 529 U.S. at 406-10, 413 (*e.g.*, the rejected decision may state the *Strickland* standard correctly but apply it unreasonably); *Woodford v. Visciotti*, 537 U.S. 19, 24-27 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Visciotti*, 537 U.S. at 24-27; *Williams*, 529 U.S. at 413. An "unreasonable application" is different from an erroneous or incorrect one. *See Williams*, 529 U.S. at 409-10; *Visciotti*, 537 U.S. at 25; *Bell v. Cone*, 535 U.S. 685, 699 (2002). Moreover, review of state court decisions under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

As the Supreme Court explained in *Harrington v. Richter*, 562 U.S. 86, 102 (2011):

"Under § 2254(d), a habeas court must determine what arguments or theories supported or, [where there was no reasoned state-court decision], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."

Furthermore, "[a]s a condition for obtaining habeas corpus from a federal court, a

7

state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Petitioner's claims were denied by the California Court of Appeal in reasoned decisions on direct appeal. (Lodgments 14, 27.) The claims then were presented in Petitions for Review, which the California Supreme Court summarily denied. (Lodgments 16, 29.) Thus, the California Court of Appeal's decisions on direct appeal constitute the relevant state court adjudication on the merits for purposes of the AEDPA standard of review. *See Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (where state supreme court denied discretionary review of decision on direct appeal, the decision on direct appeal is the relevant state-court decision for purposes of the AEDPA standard of review).

## DISCUSSION

In order to merit federal habeas relief on a claim that the trial court erred by failing to properly instruct a jury, petitioner must allege and then show that the trial court committed an error that so infected the entire trial that the resulting conviction violated his federal constitutional right to due process. *See Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). Claims of instructional error may not be judged in artificial isolation, but must be considered in the context of the trial record and the instructions as a whole. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Boyde v. California*, 494 U.S. 370, 380 (1990); *see also Cupp*, 414 U.S. at 147; *Ho v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003). In reviewing an ambiguous instruction, the court inquires whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 and n.4.

A claim of instructional error is subject to harmless-error analysis "so long as the error at issue does not categorically 'vitiat[e]' all the jury's findings." *See Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (alteration in original); *Babb v. Lozowsky*, 719 F.3d 1019, 1033 (9th Cir. 2013) ("Instructional errors are generally subject to harmless error review."), *overruled on other grounds as recognized by Moore v. Helling*, 763 F.3d 1011, 1021 (9th Cir. 2014). "When a jury instruction is erroneous because it misdescribes the burden of proof, it 'vitiates *all* the jury's findings,' and no verdict within the meaning of the Sixth Amendment is rendered." *Mendez v. Knowles*, 556 F.3d 757, 768 (9th Cir. 2008) (*citing Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993)); *see also Byrd v. Lewis*, 566 F.3d 855, 867 (9th Cir. 2009) ("The only instructional error recognized by *Pulido* as vitiating all the jury's findings is a defective overarching reasonable-doubt instruction as articulated in *Sullivan*."). Since none of petitioner's claims implicate the overarching reasonable-doubt instruction or the prosecutor's burden of proof, harmless-error analysis would apply to any instructional error in this case.

## A.      Instruction on the special circumstances allegation (Ground One).

In Ground One, petitioner claims that the jury instruction on the special circumstances allegation violated his federal constitutional rights because it failed to inform the jury that petitioner must have personally had the intent to kill. (Petition at ¶ 7a; Petition Mem. at 13-16; Reply at 6-7.)

The special circumstances allegation was based on Cal. Penal Code § 190.2(a)(22), which applies when the defendant "intentionally killed the victim while the defendant was an active participant in a criminal street gang" and "the murder was carried out to further the activities of the criminal street gang." A jury's finding that this allegation is true generally requires a sentence of death or life without the possibility of parole, but a trial court retains discretion to impose a sentence of 25 years to life in cases where the defendant is 16 or 17 years old. *See*

Cal. Penal Code § 190.5(b).

The special circumstances allegation can apply to both the actual killer and the aider and abettor, but only if they *both* possessed the intent to kill. Cal. Penal Code § 190.2(c); *People v. Ybarra*, 166 Cal. App. 4th 1069, 1085-86 (2008). Petitioner claims that CALCRIM No. 736 failed to convey this dual requirement for both petitioner and the actual shooter, Guerrero, because the instruction referred instead only to the intent of a generic defendant. CALCRIM No. 736 was read to the jury as follows (10 RT 2056-57; 5 CT 1275) (emphasis in original):

> To prove this special circumstance is true, the People must prove that:
>
> 1. The defendant intentionally killed Abraham Ortega;
>
> 2. At the time of the killing, the defendant was an active participant in a criminal street gang;
>
> 3. The defendant knew that members of the gang engage in or have engaged in a pattern of criminal gang activity;
>
> AND
>
> 4. The murder was carried out to further the activities of the criminal street gang.
>
> *Active participation* means involvement with a criminal street gang in a way that is more than passive or in name only.

The California Court of Appeal rejected petitioner's claim that the use of the non-specific word "defendant" in the instruction likely confused the jury into applying the intent requirement only to Guerrero and not to petitioner (Lodgment 14 at 6):

> [T]he trial court instructed the jury, "The word defendant applies to each defendant unless you are instructed otherwise." The jury was never told the word defendant in the special circumstances

instruction only applied to Guerrero.  Therefore, it is not likely it applied the instruction in such a narrow fashion.  [Citation omitted.]

The California Court of Appeal's rejection of this claim was not objectively unreasonable.  It was not reasonably likely that the jury applied the word "defendant" in CALCRIM No. 736 selectively only to Guerrero because the instructions on the whole apprised the jury that, unless it was instructed otherwise, the word "defendant" applied to each defendant at trial, and all of the instructions applied to each defendant.  (10 RT 1975, 1977; 5 CT 1199, 1202.)  Nonetheless, petitioner highlights the first requirement in the instruction — "The defendant intentionally killed Abraham Ortega" — to argue that the jury understood the intent requirement to apply only to Guerrero, who was the defendant who actually killed Ortega. (Petition Mem. at 14.)  To the contrary, the jury would have understood the instruction to apply equally to petitioner as an aider and abettor to the killing, given that the jury was instructed that an aider and abettor's liability would have been equal to that of a direct perpetrator.  (10 RT 2003-04; 5 CT 1230.)  It is presumed that the jury followed the instructions given to them.  *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  Nothing in the record suggested that the jury was instructed to make an exception for the general applicability of the instructions to all defendants by applying CALCRIM No. 736 in a limited way to find petitioner liable for the special circumstance without making the requisite finding of intent.  It therefore was not reasonably likely that the jury applied the challenged instruction in a way that violates the Constitution.  *See Estelle*, 502 U.S. at 72 and n.4.

Petitioner further claims that this alleged error was compounded by the prosecutor, who told the jury during closing argument that petitioner did not have to share Guerrero's intent for purposes of liability for murder under the natural and probable consequence doctrine.  In explaining that doctrine, the prosecutor argued (9 RT 1783):

You don't have to share the perpetrator's intent. Mr. Guerrero may have intended all along to go out there and kill. You step into the shoes of the perpetrator. So if you know what — you know he has an intent to go out and commit a battery or an assault and you facilitate that, you step into the shoes of the perpetrator and we get this extended liability. Natural and probable consequences.

Although the prosecutor's argument was a correct statement of the law (at that time) regarding petitioner's liability for first-degree murder as an aider and abettor under the natural and probable consequences doctrine, *see People v. Nguyen*, 21 Cal. App. 4th 518, 531 (1993), petitioner argues that the argument led the jury to conflate the requirements of the natural and probable consequences doctrine with those of the special circumstances allegation. The California Court of Appeal disagreed (Lodgment 14 at 7):

[I]n making the above argument, the prosecutor was talking about [petitioner's] culpability on the substantive charges, more specifically his culpability for the "aiding and abetting of a murder." The prosecutor did not start discussing the special circumstances allegation until much later in his argument. [Citation omitted.]

Moreover, the jury instruction on the natural and probable consequences doctrine was properly limited to the substantive charges. At no time was the jury ever told it could apply the doctrine to the special circumstances allegation, and we do not believe it is reasonably likely the jury did so. Considering the instructions as a whole, we are convinced that, in finding the special circumstances allegation true as to [petitioner], the jury necessarily determined he possessed the requisite intent to kill.

12

There is no basis for disturbing the jury's finding in that regard.

The California Court of Appeal's rejection of this claim was not objectively unreasonable. At the outset, petitioner's claim is premised on the prosecutor's closing argument, which generally carries less weight with the jury than the trial court's instructions on the law. *See Boyde v. California*, 494 U.S. 370, 384 (1990). Even so, the prosecutor's argument was not misleading about the law regarding any of the charges. The prosecutor clearly identified his argument as a discussion of the natural and probable consequences doctrine as a theory of liability for the substantive charges. Nothing was confusing or misleading about this part of the prosecutor's argument. Given the full context of the prosecutor's argument in this regard, he did not mislead the jury into thinking that it need not find petitioner had an intent to kill under the special circumstances allegation.

Moreover, the actual instructions on the special circumstances allegation, which carried more weight than the prosecutor's argument, correctly stated that each defendant, including petitioner, had to have the intent to kill. (10 RT 2051-53, 2056-57; 5 CT 1271, 1275.) It therefore was not reasonably likely that the jury applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 and n.4.

In sum, the instructions on the whole correctly informed the jury that petitioner must have personally had the intent to kill in order to meet the requirements of the special circumstances allegation. Thus, the California Court of Appeal's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.

**B.      Instruction on homicide in the defense of others (Ground Two).**

In Ground Two, petitioner claims that the jury instruction on homicide in the defense of others was unduly restrictive because it failed to allow the jury to consider evidence of prior threats by the murder victim's compatriots in assessing

the reasonableness of the actions of the actual shooter, Guerrero.  (Petition at ¶ 7a; Petition Mem. at 17-22; Reply at 7.)

The applicable instruction on justifiable homicide based on self-defense or defense of another, CALCRIM No. 505, explicitly mentioned prior threats by the murder victim, Abraham Ortega.  The instruction did not, however, mention threats by any other specific people (10 RT 2065-66; 5 CT 1285):

> If you find that Abraham Ortega threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.  If you find that the defendant knew that Abraham Ortega had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conducts and beliefs were reasonable.

For three independent reasons, the California Court of Appeal rejected petitioner's argument that this instruction did not go far enough because it did not allow the jury to consider prior threats or harm by Ortega's fellow gang members (Lodgment 14 at 7-8):

> First, there is no evidence Guerrero ever received any prior threats from Ortega's fellow gang members.
>
> Second, the underlying legal premise of [petitioner's] argument is faulty.  He assumes he was entitled to the benefit of any defenses that were applicable to Guerrero, the shooter.  However, an aider and abettor does not get the benefit of defenses that are pertinent only to the person who carries out the crime.  (*People v. McCoy* (2001) 25 Cal. 4th 1111, 1122 [aider and abettor could properly be convicted of murder even if actual perpetrator acted in unreasonable self-defense and was thus guilty only of manslaughter].)  Therefore, even if there had been

14

evidence that Guerrero had received prior threats from Ortega's fellow gang members, that evidence would not necessarily mitigate [petitioner's] culpability.

Third, the record belies [petitioner's] claim the court's instructions on antecedent threats was limited to threats made by Ortega. . . . Although Ortega was the only person specifically identified in the above instructions, the court gave other instructions that expanded on the antecedent threats doctrine. Particularly, the court told the jury, "Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person. [¶] If you find the defendant received a threat from someone else that he reasonably associated with Abraham Ortega, you may consider that threat in deciding whether the defendant was justified in acting in self-defense or defense of another."

These instructions clearly signaled to the jury that Ortega was not the only person whose prior threats may have mattered in the case. Rather, the jury could also consider the effect of any threats the defendant may have received from anyone whom he reasonably associated with Ortega, which would logically include his fellow gang members.

[Petitioner] contends that, as worded, the instructions only pertained to the situation where the defendant acted against the particular person who had actually threatened him. But the final sentence of the instruction was worded more broadly than that. By its terms, it allowed the jury to consider threats the defendant received from Ortega's associates in determining whether his actions against Ortega were justified. Therefore, the instructions

15

were not unduly restrictive.  They did not violate [petitioner's]

rights in any respect.

The Court of Appeal's rejection of petitioner's claim for these three reasons was not objectively unreasonable.  First, no evidence suggested that Guerrero ever received any prior threats from Ortega's fellow gang members.  The evidence cited by petitioner in this regard — trial testimony that Guerrero was summoned to the crime scene and told to bring a gun in order to take part in a confrontation with a rival gang — does not show that Guerrero ever knew of any prior *threats* from that rival gang.  (Petition Mem. at 19-20.)  Nor does this evidence show that Guerrero believed and relied on any prior threats as justification for his actions.  *See People v. Pena*, 151 Cal. App. 3d 462, 475 (1984) (instruction on antecedent threats requires evidence of the defendant's knowledge of the threat and of his belief and reliance thereon).

Second, as a matter of California law, Guerrero's possible entitlement to such an instruction was irrelevant as to whether petitioner, an aider and abettor, also was entitled to the instruction.  The Court is bound by the California Court of Appeal's interpretation of state law in this regard.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (state court's interpretation of state law binds a federal court on habeas review); *Waddington v. Sarausad*, 555 U.S. 179, 193 n.5 (2009) (state court's interpretation of instructional error claim as a matter of state law was beyond the province of a federal habeas court to reexamine); *see also Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (rejecting instructional error claim on federal habeas review where the state court applied state law principles to determine that the proposed instruction was unwarranted).

Third, the instruction did apprise the jury that it could consider evidence of antecedent threats by people other than Ortega, such as Ortega's fellow gang members.  The final sentence CALCRIM No. 505 apprised the jury that it could consider evidence of prior threats from "someone else that [the defendant]

reasonably associated with Abraham Ortega." (5 CT 1286.)  In light of the instructions on the whole, it was not reasonably likely that the jury applied the challenged instruction in a way that violates the Constitution.  *See Estelle*, 502 U.S. at 72 and n.4.

In sum, petitioner's claim of entitlement to a broader instruction on homicide in the defense of others is misplaced but, in any event, the jury was in fact allowed to consider broad evidence of antecedent threats.  Thus, the California Court of Appeal's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.

**C.     Instruction on the natural and probable consequences doctrine (Ground Three).**

In Ground Three, petitioner claims that an erroneous jury instruction on the natural and probable consequences doctrine as a theory of liability violated his federal constitutional rights.  (Petition at ¶ 7a; Petition Mem. at 23-34; Reply at 7-9.)

The jury was instructed on two theories of petitioner's liability of first degree premeditated murder: (1) Petitioner directly aided and abetted Guerrero in committing murder; or (2) the murder was the natural and probable consequence of a target offense that petitioner aided and abetted, specifically, assault, battery, or disturbing the peace.  (10 RT 2003-09; 5 CT 1230-33.)  After petitioner's trial ended but before his conviction became final, the California Supreme Court held in *People v. Chiu*, 59 Cal. 4th 155, 167 (2014), that the second theory of murder was invalid:  "[A] defendant cannot be convicted of first degree premeditated murder under the natural and probable consequences doctrine."

Based on the decision in *Chiu*, the California Court of Appeal held in this case that the instruction on the natural and probable consequences doctrine as a theory of first degree premeditated murder was erroneous.  But the Court of Appeal

also held that the error was harmless because it was evident from the verdict that the jury found petitioner guilty of murder under the alternative and valid theory of direct aiding and abetting. (Lodgment 27 at 6-8.)

Likewise, the instructional error in this case is harmless on federal habeas review because it did not have a substantial and injurious effect or influence in determining the jury's verdict as to petitioner's conviction of murder. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Any error under *Chiu* in instructing the jury about the natural and probable consequences doctrine as a theory of murder was harmless because that doctrine is inconsistent with the jury's verdict, which instead was based on a valid ground. *See Chiu*, 59 Cal. 4th at 167 (an erroneous instruction about natural and probable consequences, or about an incorrect theory of guilt, can be harmless if "there is a basis in the record to find that the verdict was based on a valid ground"); *see also Hedgpeth*, 555 U.S. at 61 (where an instructional error arises in the context of multiple theories of guilt, only one of which is incorrect, the error does not vitiate all of the jury's findings and is subject to harmless error analysis). The jury necessarily found, as support for a valid theory of direct aiding and abetting, that petitioner had the intent to kill (rather than merely the intent to commit a lesser target crime such as assault, battery, or disturbing the peace, under the doctrine of natural and probable consequences). This was evidenced by the jury's true finding, under the special circumstances allegation of § 190.2(a)(22), that petitioner and the actual shooter each "intentionally killed Abraham Ortega." (10 RT 2056; 5 CT 1275.) Since the jury's finding in this regard was a basis in the record to conclude that the verdict was based on a valid theory of murder, petitioner was not entitled to relief under *Chiu* because the instructional error as to his murder conviction was harmless.

Petitioner further argues that even if the jury did find that he intentionally killed Abraham Ortega, this does not mean that petitioner acted with premeditation and deliberation under a theory of direct aiding and abetting. (Petition Mem. at 29.)

18

To the contrary, under California law, when the evidence establishes the accomplice's knowledge of the direct perpetrator's intent to kill, the accomplice's premeditation can be reasonably inferred. *See People v. Samaniego*, 172 Cal. App. 4th 1148, 1166 (2009) ("It would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crimes without at least a brief period of deliberation and premeditation, which is all that is required" for first-degree murder). The evidence in this case established that petitioner decided to assist in the killing with full awareness of the actual shooter's murderous purpose: Petitioner (also known as "Turtle") decided to participate in the fight after having been present earlier during a phone call in which the actual shooter was summoned to bring a gun to the fight; and after the actual shooter arrived with a gun, petitioner continued to fight. (2 RT 263-64, 282; 4 RT 858-61; 5 RT 910-11.) From this evidence, the jury could have reasonably inferred premeditation and deliberation by petitioner.

Finally, although *Chiu* addressed a conviction of murder, petitioner argues that the reasoning of *Chiu* applies not just to his murder conviction, but also extends to his convictions of premeditated *attempted* murder. (Petition Mem. at 29-34.) The California Court of Appeal rejected this argument because it was bound by *People v. Favor*, 54 Cal. 4th 868, 879-80 (2012), which holds that a petitioner could be found guilty of premeditated attempted murder under the natural and probable consequences doctrine. (Lodgment 27 at 8 n.4.) Petitioner concedes that the Court of Appeal was bound by the California Supreme Court's decision in *Favor*, yet he somehow also argues that *Chiu* overruled *Favor* "sub silencio." (Petition Mem. at 29, 33.)[2]

---

[2] After the California Court of Appeal issued its decision in this case, the California Supreme Court did grant review in a similar case to consider whether it should reconsider *Favor*, and the issue is still pending. *See People v. Mateo* (Review granted May 11, 2016, S232674). Petitioner does not claim that his federal habeas claim of instructional error depends on the outcome of the *Mateo* proceeding.

To the extent that petitioner is now asking the Court to second-guess the California Court of Appeal's determination of the applicability of its own criminal laws in light of then-existing state precedent, it is not within the province of the Court to do so. *See Bradshaw*, 546 U.S. at 76; *see also Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (accepting as binding state court's construction of state homicide law); *see also Martin v. Ohio*, 480 U.S. 228, 232 (1987) (noting the "preeminent role of the States in preventing and dealing with crime and the reluctance of the Court to disturb a State's decision with respect to the definition of criminal conduct"); *Powell v. State of Texas*, 392 U.S. 514, 535-36 (1968) (noting that the definition of the elements of a crime and defenses "has always been thought to be the province of the States"). Accordingly, it was not objectively unreasonable for the California Court of Appeal to reject petitioner's instructional-error claim with respect to his convictions of premeditated attempted murder.

**RECOMMENDATION**

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) accepting and adopting this Report and Recommendation; and (2) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED:  February 6, 2017

_____
ALEXANDER F. MacKINNON
UNITED STATES MAGISTRATE JUDGE